**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Case No.: 6:19-cv-1249-Orl-31EJK**

**SHIH-YI LI,**

     **Plaintiff,**

**vs.**

**ROGER HOLLER CHEVROLET CO. d/b/a**
**HOLLER DRIVER'S MART,**

     **Defendant.**

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**INCORPORATED MEMORANDUM OF LAW**

Defendant, Roger Holler Chevrolet Co. ("Roger Holler"), moves for summary judgment on the Amended Complaint as there are no genuine issues of material fact and Roger Holler is entitled to judgment as a matter of law.

**SUMMARY**

Summary judgment is warranted in this case. The undisputed material facts show that Roger Holler properly terminated Plaintiff, Shih Yi Li ("Li"), for job abandonment when he failed to show up for work. On October 26, 2018, Li, who worked as a Sales Associate, requested two weeks off (from October 26, 2018 to November 16, 2018) about 20 minutes before his scheduled start time. The sole reason given was that he needed the time off to *relocate his residence.* Li's manager, Kamal Ghai ("Ghai"), denied the request and told Li to come to work. Li never returned. Under Roger Holler's policies, an employee abandons his job by missing three consecutive days without leave. Thus, on October 31, 2018, Phil Collins ("Collins"),

Roger Holler's General Manager, terminated Li for job abandonment.

This was not Li's first experience with unexcused leave. During Li's employment, he was verbally warned about requesting vacation "at the last minute" and on October 15, 2018 (days before his termination) Li received a written warning for not following his schedule, leaving work without informing his managers and taking three extra days off. The October 15th warning also unequivocally warned Li that further actions could result in immediate discharge. Still, even after his supervisor denied another last minute request, Li unilaterally took the time off anyway. After his termination, Li attempted, retroactively (on November 6, 2018), to obtain time off using a different reason – unscheduled dental surgery - until December 20, 2018. Li had already abandoned his job by that time. Consequently, Li's drummed-up claim that his termination violated the Family Medical Leave Act ("FMLA") (Count IV), is without factual or legal support.

Li also makes meritless claims for the failure to pay minimum wages under the Fair Labor Standards Act ("FLSA") and Article 10, Section 24 of the Florida Constitution ("Article X") (Counts I, II). Despite the fact Li worked as a Sales Associate for five years between two dealerships, he appears to misunderstand how he was paid. The undisputed material facts show that during his employment, Li received minimum wages (at least) for each hour worked. In fact, *Li admits this*. Moreover, the availability of potential monthly bonus constituted a separate compensation component and did not figure in Li's hourly wages. Li's Article X minimum wage allegations also fails because he failed to satisfy the pre-suit notice requirements.

2

Li additionally includes a nebulous claim that Roger Holler violated the Florida Whistleblower Act ("FWA") (Count III) when it terminated him after he allegedly complained about Roger Holler's purported "fraud upon the public" arising from its advertising to the public.  This purported false advertising includes: (1) advising customers that sales associates were paid on a "commission-free" basis and (2) establishing a "bait and switch" scheme where Roger Holler advertised cars for sale, which it did not possess, and attempted to sell different cars than what was advertised to customers upon arrival.  Yet, Li has not pointed to a single violation of any law, rule or regulation and there is simply no proof at all to support these meritless claims.

Li's FWA claim also fails because the record shows Roger Holler did not act unlawfully and Li could not have a good faith objectively reasonable belief of unlawful activing.  The undisputed material facts show that sales associates accrued a flat fee bonus credit (not a sales-based commission) based on the number of cars sold, among other factors.  Similarly, Li has not shown Roger Holler misrepresented the availability of a single car in an advertisement or that a single customer read a misleading advertisement and then was convinced to purchase a different (or higher priced) car.

Additionally, there is no factual support for a causal connection between any purported complaints about these sales practices and Li's employment termination.  At the time of his termination, Li's supervisor(s) were unaware of any alleged complaints (assuming, but not conceding, for the sake of argument they were made) and Li admits he does not remember when he complained.  Therefore, no temporal proximity exists between the purported complaints and Li's termination.  Thus, The

Court should enter summary judgment on the FWA claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   Roger Holler

Roger Holler is one of several separate dealership legal entities owned by members of the Roger Holler, Jr. family, with most including the "Holler" or "Classic" names.  Hamner Dec. at ⁋ 4.  The Holler-Classic Automotive Group functions to provide certain administrative services, including advertising, human resources, payroll and other services to the dealership entities.  *Id*. at 3.

### a.   Absenteeism and FMLA Policies

The Holler-Classic Automotive Group Associate Handbook contains an absenteeism policy (the "Absenteeism Policy").  McDonald Dec. at ⁋ 5.  It requires employees to "personally notify" their "supervisor as far in advance as possible so that proper arrangements can be made to handle your work" during an employee's absence.  *Id*. at ⁋ 7.  It also states that "if you fail to report for work or call in for three (3) consecutive calendar days you will be considered to have ***abandoned your job and will be terminated***."  *Id.* (emphasis added).

The FMLA policy is also in the Associate Handbook.  *Id* at 6.  The FMLA policy states, in relevant part, that eligible associates may take up to twelve weeks of leave based upon an associate's "serious health condition, which makes the Associate unable to perform the functions of the Associate's job."  *Id.*  The FMLA policy also states that an associate seeking qualified leave may be required to provide 30 days'

advance notice, if the leave is foreseeable.  *Id.*  Further, if the leave is for planned medical treatment, the associate must "try to schedule treatment so that it will not unduly disrupt the organization's operation." *Id.*

### b.    Acknowledgements

Li received various policies upon his hiring and during his employment, including the Associate Handbook.  McDonald at ₱ 5.  Li also received pay plans that explained his compensation as a sales associate.  *Id.*  Li acknowledged he understood the pay plans and that he would familiarize himself with the policies in the Associate Handbook.  McDonald Dec. at ₱₱ 9, 11-14.

## II.    Li's Employment

In September 2013, Li began employment as a sales associate at Holler Honda, where he sold new cars.  *Id.* at ₱ 8; Dep. I 53:9-11.  He transferred to Roger Holler's Driver's Mart (Winter Park location) in late 2014 where he began work as a sales associate in February 2015.  McDonald Dec. at ₱ 10; Dep. I 132:21-23; Collins Dec. at ₱ 5.  In that role, Li focused on selling customers used automobiles.  Collins Dec. at ₱ 6.  At Roger Holler's Driver's Mart, Li directly reported to Ghai, the Sales Manager.  Ghai Dec. at ₱ 4.  The General Manager for that location was Collins, who also had supervisory authority over Li.  Collins Dec. at ₱₱ 3, 7.

### a.  Li's Compensation

Upon Li's transfer to Driver's Mart, he received an Employment Agreement and a Pay Plan.  Collins Dec. at ₱ 8. During Li's employment he was paid, like other

sales associates, according to established compensation plans.  *Id.* at ¶ 9.  The compensation formula used for Li, and other sales associates, included pay at, or above, Florida's minimum wage for each hour worked ("Draw Wages").  *Id.*  Sales associates could also earn flat fee bonuses for selling cars and related services each month ("Bonuses").  *Id.*  Sales associates' monthly Bonuses were set off against their Draw Wages (the "Bonus Balance").  *Id.* at ¶ 11.  When sales associates accrued more Bonuses than Draw Wages, their Bonus Balance was positive and they realized the difference in a separate monthly bonus check.  *Id.*  When sales associates earned less in Bonuses than Draw Wages, their Bonus Balance was negative and they earned only their Draw Wages (at least minimum hour wages for  hours worked) with the shortfall (sometimes generically referred to as "in the bucket") carrying over to the next month.  *Id.*  The additional compensation in the form of bonuses in each ensuing month was then contingent on whether the bonuses covered the Draw Wages and any prior Bonus Balance carried over.  *Id.* at ¶¶9-11.  The number of cars sold, or a deficient Bonus Balance did not impact Draw Wages.  *Id.*; Dep. I 82:7-10, 83:18-24; 90:9-15.[1]

Bonuses were established based upon certain factors, including the number of cars sold (*i.e* 1-11.5 sold = $175 per unit), credits for financing, leases, service contracts, warranties, window tints ($25. for each), among others.  Collins Dec. at ¶ 10.  Bonuses, were not based on the sales price - like a traditional "commission." *Id.* at ¶ 31.

When Li transferred to Roger Holler, he received a Pay Plan.  *Id.* at ¶ 8.  The

---

[1] References to Li's November 16, 2020 deposition will be referred to as "Dep. I."  In addition, references to Li's December 4, 2020 deposition will be referred to as "Dep. II."

Pay Plan included a Draw of $8.05 per hour, along with entitlement to bonus credits.

*Id.* at ⁋ 9.  Li acknowledged in the Pay Plan as follows:

> ***I understand and agree that I must bring all questions I may have with respect to my compensation to the attention of my supervisor within 7 days after receiving any payment as compensation.*** … I agree that failure to provide notice to my supervisor within the aforementioned 7 days is my complete waiver of any right, legal or equitable that I may have to seek recovery against the Company except those rights that by law may not be waived.

McDonald Dec. at Ex. 1 (emphasis added); Collins Dec. at ⁋ 12.

Li tracked the hours he worked electronically.  McDonald Dec. at ⁋ 16; Dep. I 55:3-8.  Li concedes those records are correct and that he "got paid for every hour that [he] was in the company."  Dep. I 55:9-12, 86:21-25.  Li received an hourly Draw Wage between 2015 and 2018 that ranged from $8.05 to $8.25.  McDonald Dec. at ⁋ 16.  Li also earned bonus wages in months when he accrued more Bonuses than Draw Wages.  Collins Dec. at ⁋ 9; Ghai Dec. at ⁋ 8; McDonald Dec. Ex. 10 at 5; Dep. I 81:12-17; Dep. II 256:16-259:8.  Conversely, Li would not earn bonus wages in months when his Draw Wages exceeded Bonuses.  Collins Dec. at ⁋ 11; Ghai Dec. at ⁋ 9; Dep. II 259:19-260:25.

Importantly, Li admits Roger Holler paid him minimum wages wage through his Draw Wages.  Dep. II 252:9-18, 254:13-19, 255:19-25.  Moreover, Li concedes his Draw Wages were not impacted when he failed to sell enough cars to accumulate Bonuses that met or exceeded his Draw Wages.  Dep. I 92:2-3.

### a. Advertisements

Roger Holler advertises "Commission-Free Sales" as it does not pay its sales

associates a commission for the value of cars sold.  Constantine Dec. at ¶ 10. Sales associates were paid flat fee bonuses based, primarily, on the number of cars sold, among payments for other credits.  *Id.*; Collins Dec. at ¶ 10; Dep. I 80:23-81:4; Dep. II 228:16-20.  While Li claims "commission-free" advertising was false (it was not), he did not know of a single purchaser who would not have purchased a car if they knew of the flat fee bonus structure.  Dep. II. 229:19-22.  In any event, Ghai and Collins were not aware of Li ever complaining about the advertisements.  Collins Dec. at ¶ 26; Ghai Dec. at ¶¶ 13-15.

Roger Holler advertises automobiles for sale through its website that is updated at the end of each day.  Constantine Dec. at ¶ 6.  Various third party advertisers, such as Auto Trader, Cars.com, also receive the online feed identifying available cars for sale.  *Id.* at ¶ 7; Collins Dec. at ¶ 30.  When the cars are on the inventory feed, they are available for sale at the prices listed.  Constantine Dec. at ¶ 8.

There are situations where a car listed on Roger Holler's website, or in a third party advertiser's publication, may not be available by the time a customer arrives at the dealership.  Collins Dec. at ¶ 29.  Some examples include the sale of the car after the daily website update, a transaction was pending (but not closed) prior to the advertising feed update, there was a transfer of the car to another dealership either due to customer interest or to increase sales potential, or the car needed service, among other reasons.  *Id.*; Collins Dec. at ¶29.  Li even conceded these situations may occur and cause an advertised car to become unavailable for sale.  Dep. II 217:3-19.

In any event, even though third party advertisers receive a daily inventory feed,

Roger Holler has no control when third parties update their advertisements. Constantine Dec. at ¶ 7.  Moreover, Li admits he was unaware of the process through which automobiles were advertised.  Dep. II 214:11-16 ("[t]hat's not my job to understand it.").  Similarly, Li testified he does not know the process by which advertisements were sent to third party advertisers, or how often third party advertisers updated their listings.  Dep. II 215:18-216:2.

Li also could not point to any purported false advertisements and did not produce any in the litigation.  Dep. I 142:23-143:3.  When asked to supply accounts of false advertising in deposition, Li could recall only one instance.[2]  Dep. I 124:1-14. This involved a potential customer named Rafael Nieves ("Nieves") who allegedly came to Roger Holler on August 18, 2018 to buy a 2007 Honda Civic (the "Civic"), only to find the Civic not on the lot.  Dep. I 124:1-14; Dep. II 219:12-16.  Li concedes he never saw an advertisement for the Civic and does not know if, when, or where, Nieves allegedly saw the advertisement.  Dep. I 148:20-22; Dep. II 222:1-3.  Roger Holler's records, however, show that Drivers Mart had the Civic available for sale until it was sold to an Orlando Auction on August 10, 2018.  Collins Dec. at ¶ 32.

### b.  Requests for Leave and Termination

From September 2013 to December 2014, Li requested time off at Holler Honda in writing (in Change of Status forms) at least five times.  McDonald Dec. at ¶ 17. From February 2015 to October 2018, Li similarly requested time off twenty times,

---

[2] Li produced second-hand accounts of allegedly false-advertisements copied from the internet, but admits no personal knowledge of their claims. Dep. II 218:9-16; 225:23-226-13, 231:1-8, 233:6-12.

including at least four instances related to medical care.  McDonald Dec. at ¶ 18 n.1.

Still, in October 2018 Li missed multiple days of work without leave.  Ghai Dec. at ¶

19.  On October 15, 2018, Ghai issued Li an Associate Counseling Report stating:

> EXACT REASON REPORT IS BEING ISSUED: Not following the work schedule, leaving working without [i]nforming any of the managers. ***Took three extra days off***. He informed us once . . . we called him. Performance has been poor for the last couple of months.
>
> ACTION COMPANY WANTS TAKEN: If [Li] wants to leave early or needs any other days off he has to get an approval from a manager.  ***[Li] was verbally warned previously for requesting vacation at the last minute***.
>
> . . .
>
> THE ISSUANCE OF FURTHER WARNINGS MAY RESULT IN ADDITIONAL DISCIPLINARY ACTION UP TO AND INCLUDING SUSPENSION OR IMMEDIATE DISCHARGE.

*Id.* (emphasis added).  Ghai and Collins then met with Li, who refused to sign the

Associate Counseling Report.  *Id.* at ¶¶ 20-21; Collins Dec. at ¶¶ 14-15.

On October 26, 2018, Li was scheduled to work at 9:00 a.m.  Ghai Dec. at ¶ 26.

But at 8:40 a.m., Li emailed Ghai, stating: "I am asking for a leave of absent [sic] from

Oct. 26 to Nov. 16, 2018 due to down sizing and moving out of current rental house."

*Id.* at ¶ 27.  Six minutes later, Li text messaged Ghai stating: "I sent you an email

asking for a leave of absent [sic] from Oct. 26 to Nov. 16 due to my locating a duplex

and moving out of current rental house."  *Id.* at ¶ 28.  Ghai denied both "last minute"

requests and told Li to report for work.  *Id.* at ¶¶ 29-30.  Li never returned.  *Id.* at ¶ 31.

In the following days, attempts were made to contact Li, but he could not be

contacted.  *Id.* at ₧ 32.  On October 31, 2018, Collins decided to terminate Li under the Absenteeism Policy because Li abandoned his job by failing to appear at work for three consecutive days without leave.  Collins Dec. at ₧ 25.  Collins was not aware of any complaints by Li about alleged false advertising, whether he had a serious health condition, or even if Li had requested FMLA leave.  *Id.* at ₧ 26.

Li never requested medical leave, or provided medical documents to support medical leave, leading up to his termination.  McDonald Dec. at ₧ 21; Ghai Doc. at ₧ 24.  Nearly a week after his termination, on November 6, 2018, Li saw his dentist, Dr. Stacey Chan ("Chan") for a "comprehensive [and initial] oral evaluation."  Chan R. at 34.[3]  Notably, on October 18, 2018, Li missed an initial appointment with this dentist.  *Id.*  On November 8, 2018, ***eight days after his termination***, Li emailed Ghai advising of "up-coming gum surgery" sometime after "11/20" and requesting time off until December 20, 2018.  Ghai Dec. at ₧ 34.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]

---

[3] All references to records produced by Chan will be referred to as "Chan R."

[4] The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323.  When the non-moving party bears the burden of proof, the moving party need not offer affidavits negating the opponent's claim.  *Id.*  Instead, the moving party may discharge its burden by showing there is an absence of evidence to support the non-moving party's case.  *Id.* at 325. Alternatively, the moving party may support its motion for summary judgment with affirmative

## ARGUMENT

### I.   The Record Merits Summary Judgment on Li's FLSA and Article X Claims

#### a.   Roger Holler Complied with the FLSA and Article X

The Court should enter summary judgment for Roger Holler on Li's FLSA and Article X claims because the record shows Li was paid minimum wages during his entire employment.  From 2015 to 2018, the FLSA required employers to pay at least $7.25 per hour, 29 U.S.C. § 206(a)(1)(C), and Article X required Florida employers to pay at least $8.05 in 2015-2016, $8.10 in 2017, and $8.25 in 2018.  Fla. Const. Art. X, § 24(c) (2019).[5]   To prevail, Li must show he was not paid appropriate minimum wages.  *See, e.g. Chuy v. Hilton Mgmt. LLC*, 2010 WL 1854120, at *2 (M.D. Fla. May 10, 2010) (applying same standard to Article X, the FLSA, and the FMWA).

Here, Li admits he was paid minimum wage throughout his employment with

---

evidence demonstrating that the nonmoving party cannot prove its case.  *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F. 2d 1428, 1437–38 (11th Cir. 1991).

When a moving party meets its burden, the non-moving party must "go beyond the pleadings," and by affidavits or by "depositions, answers to interrogatories, and admissions on file," and designate specific evidence showing there is a "genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324.  It is the non-moving party's obligation to offer specific facts, not "mere allegations or denials of his pleadings." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This does not occur upon "the mere existence of some alleged factual dispute between the parties" or upon the presentation of a "scintilla of evidence."  *Id.* at 247-48, 252.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).  Likewise, uncorroborated and self-serving speculation cannot defeat summary judgment.  *See, e.g., Brown v. Publix Super Markets, Inc.*, 626 F. App'x 793, 797 (11th Cir. 2015). Thus, to overcome a properly supported motion for summary judgment, a [claimant] must present sufficient competent evidence so the finder of fact could return a verdict for him.  *Anderson*, 477 U.S. at 250.

[5] Florida Minimum Wage History 2000 to 2020, FLORIDA DEPARTMENT OF ECONOMIC OPPORTUNITY, https://floridajobs.org/docs/default-source/business-growth-and-partnerships/for-employers/posters-and-required-notices/2020-minimum-wage/florida-minimum-wage-history-2000-2020.pdf?sfvrsn=2 (last accessed on Jan. 14, 2021).

Roger Holler. Dep. I 78:25-79:5; Dep. II 252:9-18, 254:13-19,255:19-25.[6] Moreover, excerpts of Li's pay stubs show Roger Holler satisfied the FLSA and Article X by paying minimum wage for all hours worked. McDonald Dec. at Ex. 10. And Li further admits he does not know of, and did not search for, any time where he was not paid minimum wage during the period he worked for Roger Holler. Dep. I 87:3-6; Dep. II 255:3-16. Thus, judgment is proper as a matter of law.

### b. Pre-Suit Notice for the Article X Claim not Provided

The Court should also enter summary judgment on Li's Article X claim because he did not comply with the pre-suit notice of minimum wages owed. Prior to this lawsuit, Li's counsel generally claimed wages were owed, but did not detail the minimum wages due, the actual or estimated work dates, or the hours for which Li sought payment. Hamner Dec. at ⁋ 7.

This error is fatal as the Florida Minimum Wage Act ("FMWA")[7] requires potential litigants to provide written pre-suit notice of the "the minimum wage . . . the actual or estimated work dates and hours for which payment is sought, and the total amount of unpaid wages through the date of notice" at least 15 days before suit. Fla. Stat. § 448.110(6)(a)-(b). Courts routinely find this pre-suit notice requirement imposes the same requirement on Article X claims, and enter summary judgment

---

[6] The fact Li's Bonus Balance was negative at times, is a non-starter because a negative Bonus Balance did not affect his Draw Wages. Dep. 92:2-3; Dep. II 259:19-260:25; Ghai Dec. at ⁋ 10.

[7] In 2004, Florida passed Article X, which instituted minimum wages and authorized the Florida legislature to "adopt any measures appropriate for the implementation of this amendment." Fla. Const. Art. X, § 24(a)-(c), (f). The next year, the Florida legislature passed the Florida Minimum Wage Act and specified it "constitute[s] the exclusively remedy under state law for violations of [Article X]." Fla. Stat. § 448.110(10).

where that requirement is not met.  *See, e.g. Garcia-Celestino v. Ruiz Harvesting, Inc.,* 2013 WL 3816730, at *16–17 (M.D. Fla. July 22, 2013).  The result should be the same in this case with summary judgment granted for Roger Holler.

## II.   The Record Merits Summary Judgment on Li's FMLA Claim

The undisputed material facts and applicable law support entry of summary judgment on Li's FMLA claim.  Li vaguely alleges what appears as a FMLA interference claim.  *See* 29 U.S.C. § 2615(a)(1)-(2).  Yet, the records shows that: (1) Li did not request FMLA leave during his employment; (2) Collins (the decision-maker) was unaware of a request for qualifying medical leave (no such request was made) when he terminated Li and (3) Li did not have a qualifying medical condition.

### a.   Li Did Not Request FMLA Leave

Li did not request FMLA leave before his termination, which is a pre-requisite for a FMLA interference claim.  *See Crawford v. City of Tampa*, 464 F. App'x 856, 858 (11th Cir. 2012) (affirming summary judgment on FMLA interference claim because plaintiff failed to provide employer with "sufficient notice").

Under FMLA regulations, and the applicable FMLA policy in the Handbook, Li was required to provide sufficient notice of medical leave.  If the leave was foreseeable, at least thirty days advance notice to the employer is required.  McDonald Decl. at ⁋ 6.  29 C.F.R. § 825.302(a); *see also White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1196 (11th Cir. 2015) (an employee's need for leave is foreseeable if it is based on planned medical treatment).  And "[w]hen planning medical treatment, the employee must consult with the employer and make a reasonable effort to

schedule the treatment so as not to disrupt unduly the employer's operations . . . ." 29 C.F.R. § 825.302(e).  Li's purported leave was at the last minute – twenty minutes before his shift started – and it was to move residences - not for a medical condition. Ghai Dec. at ⁋ 27 (request for leave to *"mov[e] out of current rental house."*) (emphasis added).  Thus, Li failed to provide sufficient notice of his alleged need for leave under FMLA.

Further, Li never mentioned to either Ghai, or Collins, that he had health issues before his termination of employment.  Ghai Dec. at ⁋⁋ 22-25; Collins Dec. at ⁋⁋ 18-20.  Notably, on the same date Li claims he asked for leave (October 15, 2018), he was written up in an Associate Counseling Report for not following his work schedule, leaving work without informing his managers, and for taking three unapproved days off.  The Report also states Li was previously warned about requesting vacation at the "last minute."   Ghai Dec. at ⁋ 19 and Ex. 2.  And despite receiving the FMLA policy, and requesting leave in writing previously, Li did not request leave in writing in October 2018.  McDonald Dec. at ⁋⁋17-18. Finally, Li failed to provide documentation to support any alleged request.  McDonald Dec. at ⁋ 20; Collins Dec. at ⁋ 21; Ghai Dec. at ⁋ 24.

Most telling, Li did not even see Chan for an initial "comprehensive oral consultation" until November 6, 2018 (nearly a week after his termination).  Chan R. at 34.  Additionally, on November 8, 2018, *eight days after his termination*, Li emailed Ghai advising of "up-coming gum surgery" sometime after "11/20" and requesting time off until December 20, 2018.  Ghai Dec. at ⁋ 34.  As such, the undisputed facts

show that on October 15th – the same date Li received a written warning – Li had not seen Chan (or any other dental provider) and the only "health issues" communicated by Li were post-termination.  At the end of the day, the undisputed material facts show that Li's "last minute" request (twenty minutes before his shift was to start) for time off to move residences, combined with his unilateral decision to once again not provide advance notice or follow his schedule, along with his failure to show up to work for three consecutive days, is what led to his termination.

   **b.  No Knowledge of FMLA Leave Request When Collins Terminated Li**

   Even assuming for purposes of the argument a medical request for leave was made before Li requested time off to move residences, Collins was unaware of any request for FMLA leave by Li when he terminated Li.  Collins Dec. at ⁋⁋ 18-19. Claims for FMLA interference cannot succeed where a decision maker is unaware of a request for FMLA leave at the time of termination.  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235-6 (11th Cir. 2010).  So it is with the case here.

   Li claims he requested leave from Collins and Ghai on October 15, 2018, but as noted above, Li has provided nothing to support that story.  Before his termination, Li failed to see a dentist (or provide proof he received care) for the condition that allegedly caused the need for leave.  He also failed to follow the established practice of providing written notice (*see* Change of Status forms) or even medical documentation to support a qualified leave.  McDonald Dec. at ⁋⁋ 17-18, 20.  Conversely, the record shows Li abandoned his job and that Collins decided, on his own, to terminate Li under the Absenteeism Policy.  Collins Dec. ⁋⁋ 22-25.  At that time, Collins was unaware Li had

a health condition or any alleged leave request.  *Id.* at ¶ 19.

### c. Li Did Not Have a Serious Health Condition

There undisputed record also shows Li did not have a serious health condition that qualified him for FMLA leave on or about October 26, 2018.  "An employee has the right to take FMLA leave *only* if [he] suffers from a 'serious health condition' that makes [him] 'unable to perform the functions of [his] position." *White*, 789 F.3d at 1194 (emphasis added).[8] A "serious health condition means an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 C.F.R. § 825.113(a).  In other words, a "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves" (A) "inpatient care," or (B) "continuing treatment by a health care provider." *Pivac*, 570 F. App'x at 902-903.  "[C]ontinuing treatment by a health care provider" means "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition." 29 C.F.R. § 825.115(a). "Incapacity" means "inability to work . . . or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* at § 825.113(b).[9]

Against that backdrop, Li testified he needed FMLA leave for "gum surgery"

---

[8] *See also Barker v. R.T.G. Furniture Corp.*, 375 F. App'x 966, 968 (11th Cir. 2010) (affirming summary judgment on FMLA interference and retaliation claims because plaintiff did not establish he suffered from a serious health condition); *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 902-903 (11th Cir. 2014) (affirming summary judgment on FMLA interference and retaliation claims for failure to introduce sufficient evidence to show a "serious health condition").

[9] This inquiry is not limited to the information Roger Holler had at the time of termination, but to "all available evidence." *White*, 789 F.3d at 1194.

on October 26, 2018.  Dep. I 201:13-16.  But, as noted above, Li was not even seen by a dentist (Chan) until November 6, 2018.  Chan R. at 34.  And while Li claims he saw Chan between October 18, 2018 and November 2018, Dep. I 202:6-8, Chan's records show no such visits.  Further, the record shows Li emailed Ghai on November 8, 2018 – two days after first seeing Chan on November 6, 2018 (and post-termination), indicating he was having gum surgery in late November 2018.  Ghai Dec. at P 34.  In sum, summary judgment is warranted on the FMLA claim.

### III.    The Record Merits Summary Judgment on Li's FWA Claim

Similar to the other claims, Li's allegations under the Florida Whistleblower Act premised on alleged false advertising are meritless.  To establish a prima facie FWA claim, Li must establish that "(1) [h]e engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity."  *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1336 (M.D. Fla. 2005).  If he does, the burden shifts to Roger Holler to provide a legitimate, non-retaliatory reason for termination. S*ierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).  If that occurs, the burden shifts back to Li to prove by a preponderance of the evidence that the reason was pretextual.  *Id.*

Li has not met his burden.  The undisputed record shows that Li did not undertake a statutorily protected activity, no causal link exists between a statutorily protected activity and termination, and the termination was for a legitimate reason.

### a.  Li Did Not Engage in a Statutorily Protected Activity

Under the FWA, "an employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). This requires a plaintiff to "specify exactly which rule, law or ordinance was [allegedly] being violated." *Denarii Sys., LLC v. Arab*, 2013 WL 6162825, at *4 (S.D. Fla. Nov. 25, 2013). A majority of courts also require plaintiffs to show a defendant "actually engaged in activities that violated those laws, rules or regulations or that [he] refused to participate in activities that would have violated a law, rule or regulation." *Purdue Pharma*, 369 F. Supp. 2d at 1338.[10] Meanwhile, a minority requires a "good faith, objectively reasonable belief" of illegality. *Canalejo v. ADG, LLC*, 2015 WL 4992000, at *2 (M.D. Fla. Aug. 19, 2015). Li can do neither.

As a threshold matter, Li's claim fails because has not identified any specific rule, law or ordinance he believes Roger Holler violated. Even if he could, he cannot prove Roger Holler violated the law through its commission-free advertisements or the purported bait and switch allegations. In this regard, sales associates, including Li, realize extra flat fee Bonuses when their Bonus Balance is positive, meaning their Bonuses outweigh their Draw Wages. Ghai Dec. at ⅌ 8. The bonuses paid are not "commissions." Collins Decl. at ⅌ 31.

---

[10] *See also Graddy v. Wal-Mart Stores E., LP*, 237 F. Supp. 3d 1223, 1228 (M.D. Fla. 2017) (adopting "actual violation" standard); *Norman v. Bright Horizons Family Sols., LLC*, 2014 WL 272720, at *5 (M.D. Fla. Jan. 23, 2014) (plaintiff must "actually prove the violation" of law).

Li also cannot demonstrate a "good faith, objectively reasonable belief" of any unlawful conduct.   Whether a belief is objectively reasonable is a matter of law properly resolved by the Court on summary judgment.  *See Gleason v. Roche Labs., Inc.,* 745 F. Supp. 2d 1262, 1273 (M.D. Fla. 2010) (entering summary judgment because plaintiff did not have sufficient basis to form an objectively reasonable belief).   An individual cannot have an objectively reasonable belief of unlawful activity without sufficient foundational context.  *See id.*

Here, Li has not established, or shown material issues of fact, that he had an objective reasonable belief that Roger Holler's advertisements about how its sales associates were compensated was unlawful.   Advertisements that reflect "Commission-Free Sales" are accurate in that the sales associates are not paid on commission sales (the higher the sale price to a customer, the higher the commission earned by the sales associate).   Instead, sales associates' compensation includes flat fee bonus credit payments, that bear no relevance to commissions earned from the sales price.   Constantine Dec. at ⁋ 10; Collins Dec. at ⁋⁋ 14, 31.   Further, there is no proof that a single advertisement was false, that there was ever an intent to mislead, or that anyone relied upon allegedly false advertisements and was harmed.   *See* Dep. II. 229:19-22.

With respect to the "bait and switch" advertising allegations, there is likewise insufficient evidence to support Li's claims.   In fact, for those automobiles listed on the Holler daily advertising feed (the primary advertising modality), they are only included if they are available for purchase when published.   Constantine Dec. at ⁋ 8.

And Li admitted he had no knowledge as to the process by which cars were advertised and determined to be available for sale, including how often Roger Holler updated its advertisements or how third parties advertise Roger Holler automobiles and update their advertisements to reflect car availability.   Dep. II 214:11-19, 215:18-216:2, 217:23-218:8.

Moreover, Li conceded a car could appear on an advertisement as available for sale, but ultimately not available for a variety of reasons (car sold following the ad, a sale was pending when the ad was run, car was unexpectedly placed in the shop for repairs and/or transferred to another shop, third party advertisers failed to update their ads, among other reasons).   Dep. II 217:3-19; Constantine Dec. at ⁋ 9.

Additionally, Li concedes for any so-called customer complaints about the advertising and car availability, he did not follow-up to actually review the advertisements at issue.   Dep. II 234:3-12 ("[that]'s not my job").   Li cannot save his claim through his singular allegation of false advertising relating to the Civic.   Li concedes he never saw advertising for the Civic and does not know where Nieves allegedly saw same.   Dep. I 148:20-22; Dep. II 222:1-3.   Worse still, Li's only first-hand understanding of the Civic came from a check of Roger Holler's computer inventory for August 18, 2018.   Dep. II 223:3-25.   Had he probed further into the Civic's history, which would have been reasonable if he suspected illegality, he would have discovered that Roger Holler purchased the Civic on August 7, 2018 and sold it on August 10, 2018.   Collins Dec. at ⁋ 32.   In sum, Li has not shown a material issue of fact exists on any statutorily protected activity.

### b. No Causal Link Between Any Statutorily Protected Activity and Termination

Aside from the lack of statutorily protected activity, which defeats Li's FWA claim, there is no link between any protected activity and Li's termination.  Li must show   "the employer's awareness of a protected activity *and* a 'close temporal proximity' between the awareness and the [termination]." *Novella v. Wal-Mart Stores, Inc.*, 226 F. App'x 901, 903 (11th Cir. 2007) (emphasis added).  He can do neither.

Regarding the first prong, when decision makers are unaware of statutorily protected activity summary judgment is appropriate.  *See, e.g. Hamm v. Johnson Bros.*, 2008 WL 2783366, at *7 (M.D. Fla. July 17, 2008) (granting summary judgment on FWA claim where decision maker was not aware of an alleged statutorily protected activity).  Collins was not aware of any complaints about allegedly false advertising when he terminated Li.  Collins Dec. at ⁋ 26.

Likewise, there is no evidence of temporal proximity for causation.  The time between the allegedly statutorily protected activity and termination must be "very close."  *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013).  There is no proof of this "close" temporal proximity.  In fact, Li has not produced a scintilla of evidence to support a complaint about the advertising practices at or near the time of his termination.  To the contrary, Li concedes he cannot identify any dates upon which he purportedly complained about false automobile advertising to any specific superior.  Dep. I 140:21-141:1; Dep. II at 230:10-14, 231:1-8, 233:6-12.  The Court enter summary judgment for Roger Holler because Li has not shown any temporal

proximity to his termination. *See Winnie v. Infectious Disease Assocs., P.A.*, 2016 WL 11670293, at *4 (M.D. Fla. Sept. 21, 2016) (disposing of FWA claim because, "theoretically the objection could have occurred at any time.").

### c. Li was Legitimately Terminated

Even assuming Li has established a prima face case (which Roger Holler denies) summary judgment is also proper because Li was terminated for a legitimate and non-retaliatory reason. In this regard, Roger Holler's burden is light because it need only produce, not prove, a legitimate reason. *Cf. Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). Here, Li was terminated for a violation of the Absenteeism Policy. Collins Dec. at ¶ 25. Job "[a]bandonment is a legitimate, non-discriminatory reason for discharge." *Hamilton v. Sheridan Healthcorp, Inc.*, 2014 WL 2177798, at *6 (S.D. Fla. May 25, 2014). And under the applicable Absenteeism Policy, Li's unapproved (and chronic) absences constituted job abandonment. Collins Dec. at ¶ 25. As noted above, Li was well aware of how to request time off properly, whether for medical leave or otherwise – he simply failed to do so and, instead, took time off even though his request was denied. *See* McDonald Dec. at ¶¶18 n.1; 20-21; Ghai Dec. at ¶¶ 26-33; Collins Dec. at ¶¶ 22- 25.

There is simply no evidence the termination was pretextual. *See Norman*, 2014 WL 272720, at *8. This evidence must show the "proffered reasons were a coverup for a discriminatory decision." *Turner v. Inzer*, 521 F. App'x 762, 764 (11th Cir. 2013) (cleaned up). The record here is devoid of any such evidence of pretext, much less "significantly probative" evidence.

In sum, summary judgment should be entered on all claims in the Amended Complaint as there are no genuine issues of material fact and Roger Holler is entitled to judgment as a matter of law

## CONCLUSION

For the reasons above, there are no genuine issues of material fact and Roger Holler is entitled to judgment as a matter of law.

**DATED:** February 16, 2021.　　　　　　　Respectfully submitted,

By:  /s/ Sherril M. Colombo
Sherril Colombo, Esq.
Fla Bar. No. 0948799
E-Mail:  scolombo@littler.com
Secondary:  grivas@littler.com
Ryan P. Forrest, Esq.
Fla Bar. No. 111487
E-Mail:  rforrest@littler.com
Secondary:  grivas@littler.com
LITTLER MENDELSON, P.C.
333 SE 2nd Ave., Ste. 2700
Miami, FL 33131
Telephone: 305-400-7500
Facsimile: 305-603-2552

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 16, 2021, I emailed the foregoing document to: Melissa Mihok, CPLS, P.A., 201 E. Pine St., Suite 445, Orlando, FL 32801, E-Mail: mmihok@cplspa.com.

<u>/s/ Sherril M. Colombo</u>
Sherril M. Colombo
Fla Bar. No. 0948799